UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

STEVEN LEVY,

                              Plaintiff,

              v.

DOMINIC MAGGIORE, JASON SANTIAGO,
THOMAS PRAGIAS, JOHN KAMEN, HUGH
WARD and RAICHE ENDE MALTER &
CO., LLP,

                              Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-2219 (MKB)

MARGO K. BRODIE, United States District Judge:

 Plaintiff Steven Levy commenced this action on April 11, 2013, against Defendants

Dominic Maggiore, Jason Santiago, Thomas Pragias, John Kamen and Hugh Ward (collectively

the "IBG Defendants"),[1] and Raiche Ende Malter & Co., LLP ("Raiche Ende").  Plaintiff alleges

claims of fraud pursuant to sections 10(b) and 20(a) of the Securities Exchange Act (the

"Exchange Act"), 15 U.S.C. §§ 78j(b) ("section 10(b)") and 78t ("section 20(a)"), as well as

common law claims of fraud, fraud in the inducement, and for an accounting against the IBG

Defendants.  Plaintiff also alleges an aiding and abetting fraud claim against Raiche Ende.

Plaintiff filed an Amended Complaint on October 8, 2013, adding a claim of fraud and violations

of section 10(b) of the Exchange Act against Raiche Ende, and withdrawing the claim for an

accounting as to the IBG Defendants.  (Docket Entry No. 14.)  All Defendants move to dismiss

the Amended Complaint and Plaintiff seeks leave to submit a Second Amended Complaint

---

[1] Defendants were members of the board of directors of Integrated Beverage Group, Ltd. ("IBG"), a New York corporation.

("SAC"), (annexed to Declaration of Christopher Travis in Opposition to Defendants' Motion to Dismiss ("Travis Decl." as Ex. 11), and to submit a revised Second Amended Complaint, (Docket Entry No. 32), which the Court refers to as the Third Amended Complaint. For the reasons set forth below, the Court accepts Plaintiff's Second Amended Complaint and considers it in deciding the motions, and grants Defendants' motions to dismiss the Second Amended Complaint. The Court denies Plaintiff's motion to submit the Third Amended Complaint, but grants leave to amend the Second Amended Complaint only as to Maggiore and to add the second proposed plaintiff.

## I. Background

IBG was a New York corporation that manufactured sports, recreational and "nutraceutical" beverages.[2] (SAC ¶ 4.) The IBG Defendants are current or former officers and directors of IBG, and Raiche Ende was IBG's accounting firm. (*Id.* ¶ 2.)

In May 2009, IBG offered a private placement of shares to Plaintiff and other investors, (the "May 2009 private placement"), and engaged a non-party brokerage firm, Lighthouse Financial Group, Inc. ("Lighthouse Financial"), to act as its agent in the placement. (*Id.* ¶¶ 28–29.) The IBG Defendants instructed Lighthouse Financial brokers to market shares in IBG by telling potential investors that IBG had $2,130,000 in sales in 2008, and was "on track" to earn more than $2,000,000 in sales in 2009. (*Id.* ¶¶ 30–31.) Lighthouse Financial brokers gave Plaintiff a Private Placement Memorandum ("PPM") in connection with the May 2009 Private

---

[2] In reviewing Defendants' motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts all of the factual allegations in the Second Amended Complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011).

Placement.[3]  (*Id.* ¶ 32.)  The PPM stated that IBG's auditor, Raiche Ende, had provided

preliminary audited results of 2008 that reflected "gross sales of approximately $2,130,000," as

compared to $289,000 in 2007, and that the growth in sales from 2007 to 2008 was 737%.  (*Id.*

¶¶ 32–33.)  In addition to giving Plaintiff a copy of the PPM, Lighthouse Financial brokers

verbally told Plaintiff that IBG was on the verge of going public, and that the proceeds of

Plaintiff's investment in IBG would go toward marketing, branding and product development.

(*Id.* ¶¶ 31–32, 47.)  Plaintiff purchased 350,000 shares of IBG stock between September and

November 2009.  (*Id.* ¶ 3.)  In purchasing the shares of IBG stock, Plaintiff relied on oral and

written representations made by IBG and Raiche Ende that IBG had more than $2,130,000 in

gross sales in 2008, that IBG was about to go public, and that Plaintiff's investment would be

used for marketing and product development.  (*Id.* ¶ 6.)

In reality, IBG did not have either gross or net sales of $2,130,000, and received only

$1.575 million for goods shipped in 2008.  (*Id.* ¶¶ 38–39.)  According to the Lighthouse

Financial broker who sold Levy his shares, a portion of the claimed sales of $2,130,000 were

"consignment shipments," which were shipments of products to retailers, for which title did not

pass and the sale was not complete until a customer purchased the product from the retailer.  (*Id.*

¶ 8.)  These sales were also comprised of "'guaranteed sales,' meaning IBG would pay retailers

for its products if they went unsold."  (*Id.* ¶ 40.)

A section titled "Risk Factors," in the PPM includes the following language:

> The Company's gross sales include all shipped goods inclusive of
> merchandise sold by retailers pursuant to in-store promotions,

---

[3]  The PPM is dated May 5, 2009.  (Private Placement Memorandum ("PPM"), annexed to Declaration of Dominic Maggiore ("Maggiore Decl.") as Ex. A at 1.)  Plaintiff's memorandum of law in opposition to Defendants' motions to dismiss states that this PPM was given to Plaintiff in or about August 2009.  (Pl. Opp'n Mem. 3.)

> coupons, slotting fees, co-operative advertising fees, rebate and
> free-bate programs. Accordingly, retailers deduct the cost of these
> goods and in certain programs deduct their per unit profit from their
> invoices which reduces the net cash receipts of the Company. No
> assurances can be given that the Company will collect payment for
> all of the goods sold as these deductions and other deductions are
> taken by retailers and, in certain cases, by wholesalers.

(PPM, annexed to Declaration of Dominic Maggiore ("Maggiore Decl.) as Ex. A, at 19.)

In addition, instead of using the proceeds from the May 2009 private placement for marketing and product development as represented to Plaintiff, the IBG Defendants used all of the proceeds to compensate officers and to pay directors' fees. (SAC ¶ 47.) The IBG Defendants "had the power and authority to control the contents" of the PPM, as well as the representations made by Lighthouse Financial brokers to potential investors. (*Id*. ¶ 26.) The IBG Defendants either "disseminated" the information contained in the PPM, or were aware that the statements contained therein were false and misleading. (*Id*.)

An independent audited financial statement completed by Raiche Ende ("2008 Audited Financial Statement") and issued on June 8, 2009, stated that IBG's 2008 sales were $2,130,000, and stated "revenue is recognized at the time the product is shipped to the buyer." (*Id*. ¶ 51; 2008 Audited Financial Statement, annexed to Travis Decl. as Ex. 2, at 1, 6.) This revenue recognition statement contradicted the statement in the May 2009 PPM that IBG "booked sales when shipped — whether there was a buyer or not." (*Id*.) Because there were few, if any, "buyers" of IBG's products in 2008, the audited 2008 sales figure was a misrepresentation. (*Id*.) Raiche Ende also failed to identify the amount of compensation paid to IBG officers and directors, and the amount of time those officers and directors dedicated to IBG business on IBG's federal corporate tax returns. (*Id*. ¶ 52.) In addition, Raiche Ende conspired with the directors of IBG to refrain from deducting the "directors['] fees paid to IBG directors," who in

turn failed to report these amounts on their own individual tax returns. (*Id.*) In 2011, the

directors and officers of IBG sold IBG's most valuable brand, "Power Ice," for $1,000,000.

(*Id.* ¶ 53.) IBG subsequently declared bankruptcy, leaving Plaintiff's shares in IBG worth

nothing. (*Id.*)

## II. Discussion

### a. Standards of Review

#### i. Motion to dismiss

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, the court "must take all of the factual allegations in the complaint as true." *Pension

Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv.

Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir.

2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)); *Matson v. Bd. of Educ.*,

631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320

(2d Cir. 2009)). A complaint must plead "enough facts to state a claim to relief that is plausible

on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*,

556 U.S. at 678); *see also Pension Ben. Guar. Corp.*, 712 F.3d at 717–18. "[W]here the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"

*Pension Ben. Guar. Corp.*, 712 F.3d at 718 (alteration in original) (quoting *Iqbal*, 556 U.S.

at 679). Although all allegations contained in the complaint are assumed true, this principle is

"inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) any documents deemed integral to the complaint, and (4) public records. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (documents attached to the complaint and those incorporated by reference); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records). In the context of securities litigation, the Court may consider "any written instrument attached to the Complaint as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (alteration, citation and internal quotation marks omitted).

### ii. Amendment of a complaint

The Federal Rules of Civil Procedure provide that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has stated that "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted). Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008); *Savitsky v. Mazella*, 210 F. App'x 71, 72 (2d Cir. 2006) ("It is well

established that leave to amend a complaint need not be granted when amendment would be futile." (quoting *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003))). "[M]ere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for [a] district court to deny the right to amend." *Azkour v. Haouzi*, No. 11-CV-5780, 2012 WL 3667439, at *2 (S.D.N.Y. Aug. 27, 2012) (citation and internal quotation marks omitted) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)). An amendment is futile if the proposed claim could not survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted). "Bad faith exists when a party attempts to amend its pleading for an improper purpose." *Id.* (citing *Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir.1998) (affirming denial of leave to amend a complaint where the plaintiff sought to "erase . . . admissions [made] in [the previous] complaint"), *abrogated on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The Second Circuit has identified prejudice to the opposing party resulting from a proposed amendment as among the "most important" reasons to deny leave to amend. *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010). It is "within the sound discretion of the district court to grant or deny leave to amend." *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)); *MHANY Mgmt. Inc. v. County of Nassau*, 843 F. Supp. 2d 287, 340 (E.D.N.Y. 2012).

### b. Exchange Act claims

Plaintiff asserts claims of violations of § 10(b) and § 20(a) of the Exchange Act against the IBG Defendants and Raiche Ende. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [Securities and Exchange]

Commission may prescribe . . . ." 15 U.S.C. § 78j(b); *see Dalberth v. Xerox Corp.*, --- F.

3d ---, ---, 2014 WL 4390695, at *9 (2d Cir. Sept. 8, 2014); *Capital Mgmt. Select Fund Ltd. v.*

*Bennett*, 680 F.3d 214, 225 (2d Cir. 2012). The corresponding Securities and Exchange

Commission ("SEC") regulation provides that:

> It shall be unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate commerce, or of
> the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud, (b) To
> make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in
> the light of the circumstances under which they were made, not
> misleading, or (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or deceit upon
> any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Liability under § 10(b) is referred to as "primary liability." *See, e.g.*,

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994)

(discussing "requirements for primary liability under Rule 10b–5"); *Levitt v. J.P. Morgan Sec.,*

*Inc.*, 710 F.3d 454, 467 (2d Cir. 2013) (discussing district court finding that allegations were

"sufficient to state a claim for primary liability under § 10(b)"); *see also Stoneridge Inv.*

*Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 166 (2008) ("the implied right of action in

§ 10(b) continues to cover secondary actors who commit primary violations").

The Exchange Act also provides for secondary liability, or "controlling-person liability,"

through § 20(a), for "'[e]very person who, directly or indirectly, controls any person' directly

liable under the Securities Exchange Act."[4] *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 371 (2d Cir.

---

[4] Section 20(a) states in relevant part:
> Every person who, directly or indirectly, controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the

2014) (quoting 15 U.S.C. § 78t). "Controlling-person liability" may be pled as an alternative to primarily liability as a basis for establishing liability.[5] *See Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 368–69 (S.D.N.Y. 2013) ("While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage." (citing *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010))); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("'Controlling-person liability' is a separate inquiry from that of primary liability and provides an alternative basis of culpability." (citing *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975)); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (same).

### i. Section 10(b) claim

Plaintiff alleges violations of § 10(b) against the IBG Defendants and Raiche Ende. (SAC ¶¶ 55–67, 92–95.) To prevail on a claim pursuant to section 10(b) and the corresponding Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Stoneridge*, 552 U.S. at 157); *see also Dalberth*, --- F. App'x at ---, 2014 WL 4390695, at *10.

---

same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

[5] Plaintiff alleges both primary and controlling-person liability. (SAC ¶ 58 ("All of the IBG Defendants are sued either as either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons . . . .").)

In addition a plaintiff must make a threshold showing that the material misrepresentation was made by the defendant. *See* 17 C.F.R. § 240.10b–5 ("It shall be unlawful for any person, directly or indirectly . . . [t]o *make* any untrue statement of a material fact or to omit to state a material fact necessary . . . ." (emphasis added)); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. ---, ---, 134 S. Ct. 2398, 2407 (2014) ("Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit *making* any material misstatement or omission in connection with the purchase or sale of any security." (emphasis added)). "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. ---, ---, 131 S. Ct. 2296, 2302 (2011).

A claim of securities fraud under § 10(b) of the Exchange Act "must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995." *City of Pontiac*, 752 F.3d at 184. Rule 9(b) of the Federal Rules of Civil Procedure provides that, when bringing a complaint "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014). The Private Securities Litigation Reform Act ("PSLRA") requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Steginsky*, 741 F.3d at 368. In addition, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind."  15 U.S.C. § 78u-4(b)(1)(A); *Steginsky*, 741 F.3d at 368.

## 1. IBG Defendants

The gravamen of Plaintiff's § 10(b) claim against the IBG Defendants is that they falsely and recklessly overstated and misrepresented IBG's 2008 gross sales as $2,130,000, both in writing in the PPM and orally through Lighthouse Financial brokers.  (*See* SAC ¶¶ 30–38.) Plaintiff also alleges that the IBG Defendants falsely represented IBG's performance, growth, business operations and future prospects by suggesting that IBG was about to go public, and made untrue statements about how IBG would use offering proceeds.  (*Id.* ¶¶ 6, 47, 59, 63.)  The IBG Defendants argue that Plaintiff has not adequately pled that they made any material misrepresentations or that they acted with the requisite state of mind, and that Plaintiff has failed to state a basis for individual liability against the IBG Defendants.  (IBG Defendants Memorandum of Law in Support of Motion to Dismiss ("IBG Def. Mem.") 8–15, 19–25.)  As discussed below, while Plaintiff has arguably alleged sufficient facts to show that the IBG Defendants made a material misrepresentation with respect to the statement of 2008 gross sales in the PPM, only one of the IBG Defendants, the CEO Dominic Maggiore, can be said to have "made" this statement, and Plaintiff has failed to adequately plead scienter as to him.  Therefore, Plaintiff has failed to state a § 10(b) claim against any of the IBG Defendants.

### A. Material Misrepresentation

Plaintiff alleges that the IBG Defendants made three actionable material misrepresentations: (1) that IBG had 2008 gross sales of $2,130,000 as stated in the May 2009 PPM and in the oral statements by Lighthouse Financial brokers, (2) that IBG was "about to go public," and (3) that the IBG would use the proceeds raised from the 2009 private placement for marketing and product development.

**(1)   2008 gross sales of $2,130,000**

Plaintiff alleges that the IBG Defendants made material misrepresentations in the May

2009 PPM and in oral statements made by Lighthouse Financial brokers.  Plaintiff cites to page

11 of the March 2009 PPM, which states that "the Auditors [Raiche Ende] have informed [IBG]

that the preliminary audited results for 2008 will reflect gross sales of approximately $2,130,000,

as compared to 2007 gross sales of $289,000."  (SAC ¶¶ 31–32; *see* PPM 11.)[6]  Plaintiff claims

that the statement was false, that IBG did not have $2,130,000 in sales in 2008, and that these

"sales" were actually consignment shipments, in which IBG "shipped product to retailers to be

placed on retailers' shelves but title would only pass if (and no sale would take place until) a

customer purchased the IBG product," or "'guaranteed sales," in which IBG "would pay retailers

for its products if they went unsold."  (SAC ¶¶ 8, 37–40.)  The IBG Defendants argue that any

oral representations made by the Lighthouse Financial brokers are not actionable

misrepresentations, as they are contradicted by written statements in the PPM itself stating that

IBG's "gross sales include all shipped goods," (IBG Def. Mem. 12 (quoting PPM 19)), including

"goods shipped pursuant to various programs with retailers for which IBG could not guarantee

collection of payment," (*id*.).  The IBG Defendants further argue that the Amended Complaint

fails to meet the heightened pleading requirements of the PSLRA.  (IBG Def. Mem. 19–22; IBG

Def. Reply 8–11.)  The Court addresses this argument first.

**a.   Plaintiff pled sufficient facts**

The SAC alleges that "the broker who . . . sold [Plaintiff] his IBG stock . . . told

[Plaintiff] that in reality, IBG did not have sales, either gross or net, of $2,130,000 in product in

---

[6]  The Court reviews the PPM as incorporated by reference into the SAC.

2008, but that IBG booked consignment shipments and other fictitious sales as 'sales' in order to inflate its sales numbers." (SAC ¶ 8.) In addition, Plaintiff includes affidavits from two former Lighthouse financial brokers, Jeffrey Wallner and Brad Feinstein, with his opposition papers opposing Defendants' motions to dismiss.[7] (*See* Affidavit of Jeffrey R. Wallner ("Wallner Aff."), annexed to Travis Decl. as Ex. 4; Affidavit of Brad Feinstein ("Feinstein Aff."), annexed to Travis Decl. as Ex. 5.) Wallner states that in May 2011, he purchased the "Power Ice" brand from IBG, and during the due diligence process associated with that transaction, Maggiore told Wallner that many of the reported sales for 2008 and 2009 "were consignment sales and 'chargebacks' (shipments to retailers that had to be bought back by IBG if the product didn't sell)." (Wallner Aff. ¶ 10.) Plaintiff also attaches to the SAC a document from IBG's bankruptcy proceedings, which identifies two retailers as "contingent creditors," each claiming $250,000 for "returned merchandise." ("List of Creditors," annexed to Travis Decl. as Ex. 6.)

Plaintiff also submits an email from Maggiore to Feinstein, one of the Lighthouse Financial brokers, dated March 16, 2010, along with an unsigned "term sheet," dated March 3, 2010, as an attachment. (Email dated Mar. 16, 2010, annexed to Travis Decl. as Ex. 7.) The email explains that the unsigned attachment is a term sheet between IBG and Walgreen's for the Fall of 2010, in which IBG "agrees to a guaranteed sale on all products sold to Walgreens." (*Id.* at 1, 3) The term sheet also states that IBG understands that if the item does not meet Walgreens['] sales expectations, Walgreens will . . . send all remaining store and DC inventory back" to IBG. (*Id.*) Plaintiff asserts that "together these documents are consistent with the

---

[7] The SAC refers to the "Lighthouse Financial broker who had sold [Plaintiff] his IBG stock" as the source of information regarding his allegations that the 2008 gross sales are largely consignment shipments. (SAC ¶ 8.) The Court construes and reviews the Wallner and Feinstein affidavits as documents attached to the SAC.

assertions by plaintiff that the products shipped to retailers were not sales . . . ." (Pl. Opp'n Mem. 6.)[8]

Wallner's affidavit statements provide a sufficient basis for Plaintiff to "state with particularity all facts on which" Plaintiff relies to support his belief that IBG's 2008 gross sales were in fact comprised largely of consignment shipments. The IBG Defendants argue that Wallner's failure to attach or cite to "any actual documentary evidence," of a consignment arrangement precludes Plaintiff's reliance on Wallner's affidavit to state the facts with particularity. The Court disagrees. Neither Rule 9(b) nor the PSLRA impose such a stringent requirement. Defendants' arguments that sworn statements based on personal knowledge must be substantiated with documentary evidence would transform the pleading standard into a summary judgment standard. Plaintiff is only required to show that the source of the belief is someone in a position to have had personal knowledge. *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 329–30 (S.D.N.Y. 2009) ("Where plaintiffs rely on confidential witnesses in support of their allegations [made on information and belief], they need not identify them by name, but they must describe each informant 'with sufficient particularity to support the probability' that someone in the informant's position would possess the information alleged"),

---

[8] The IBG Defendants object to the submission of these documents for the Court's consideration on the grounds that they were not referenced in the Amended Complaint, and argue that the affidavits are self-serving in that the Lighthouse Financial brokers are concerned with their own potential liability for having made allegedly false statements to Plaintiff. (*Id.* at 10.) As discussed *supra* in note 7, the Court construes the Wallner and Feinstein affidavits as documents attached to the SAC. In addition, at the motion to dismiss stage, the Court does not assess the credibility of a sworn statement. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (noting that Court's role during motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof" (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980))). Moreover, the IBG Defendants have had the opportunity to address the Wallner and Feinstein affidavits and robustly challenge their sufficiency.

*aff'd*, 371 F. App'x 212 (2d Cir. 2010); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392–93 (S.D.N.Y. 2007) (finding that plaintiff's submission of statements from confidential witnesses, "all of whom claim knowledge of a systemic failure in the Company's ability to manage its financial information [and] occupied positions that would have allowed for relevant hands-on experience in various parts of the Company," provides sufficient particularized facts to support plaintiff's allegations made under Rule 9(b) and the PSLRA); *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (finding that plaintiff's reliance on confidential witness statements to buttress allegations made on information and belief met heightened pleadings standard of PSLRA, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").

The fact that Wallner purchased the "Power Ice" brand from IBG and had to conduct a due diligence examination of IBG in order to do so, reasonably establishes a basis for his personal knowledge of relevant financial material and information, and provides a sufficient basis to find that Plaintiff has pled the allegations with particularity.[9] *See New Orleans Empls. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10 (2d Cir. 2011) (reversing and remanding district court's dismissal of plaintiff's claim for insufficiently alleging a factual basis for scienter, and finding that the statements of three confidential witnesses, "former Celestica employees who

---

[9]  The Court agrees with the IBG Defendants that the sworn statement of Feinstein, which provides only that he "came to find out" that IBG did not have $2.1 million in sales for 2008 but provides no further elaboration, is too generalized and is not based on an adequate basis of personal knowledge required to meet the pleading requirement.  Because the Court finds that the Wallner affidavit provides a sufficient factual basis to support Plaintiff's belief that the 2008 gross sales were falsely stated, the Court does not consider the Maggiore email or IBG's bankruptcy proceedings in finding that the SAC meets the heightened pleading requirements for alleging a misrepresentation.

occupied positions in the company that afforded them direct knowledge of Celestica's inventory buildup during the class period," who "provided information about rising inventory levels to [the individual defendants] directly or participated in meetings where they heard [the individual defendants] informed by others about the company's inventory management problems" was sufficient to meet the plaintiff's pleading burden"); *cf. City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010) ("appellants rely on opinions of confidential witnesses to support their allegations, but they fail to offer any factual underpinnings for those opinions").

Because Plaintiff, through the Wallner affidavit, has "plead[ed] the circumstances that allegedly constitute fraud 'with particularity,'" *see Krys*, 749 F.3d at 129, the allegations in the SAC that the IBG Defendants' statement about the the 2008 gross sales was a misrepresentation meets the pleading requirements of the PLSRA and Rule 9(b).

### b. Statement was misleading.

Plaintiff contends that the inclusion of consignment shipments in the gross sales amount, where goods are shipped to a retailer but title does not pass until they are purchased by a customer, is improper and does not fit within the definition of "sales." (Pl. Opp'n Mem. 22–23.) Plaintiff further contends that because the PPM "does not mention 'consignments' . . . 'charge-backs' . . . [or] 'guaranteed sales,' all of which means that there is no buyer when the product is shipped, because there is no guarantee to payment," the estimate of 2008 gross sales presented in the May 2009 PPM materially misrepresented and inflated the financial health of IBG. (*Id.*) Plaintiff further alleges that IBG "did not have $2,130,000 in sales in 2008, net, gross or

otherwise."[10]  (*Id.* ¶ 38.)  The IBG Defendants argue that the "language in the PPM cautioning

. . . that IBG would not collect payment for all goods that were included in Raiche Ende's

preliminary 'gross sales' figure" clearly cautioned Plaintiff against reliance on any oral

statements to the contrary.  (IBG Defs. Mem. 17–18.)

Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit

to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5;

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, --- F.3d ---, ---, 2014 WL 3973877,

at *8 (2d Cir. Aug. 15, 2014) (same).  A statement is considered materially misleading under §

10(b) when its "representations, viewed as a whole, would have misled a reasonable investor."

*Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81, 83 (2d Cir. 2014) (quoting *Rombach v. Chang*,

355 F.3d 164, 178 n.11 (2d Cir. 2004)).  To establish the materiality of the misrepresentation, a

plaintiff must "allege[] 'a statement or omission that a reasonable investor would have

considered significant in making investment decisions.'"  *Litwin v. Blackstone Grp., L.P.*, 634

F.3d 706, 717 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d

Cir. 2000)).  Although § 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any

and all material information," where the misrepresentation in question is an omission, the

plaintiff must allege that "there [i]s a substantial likelihood that the disclosure of [the omitted

fact] 'would have been viewed by the reasonable investor as having significantly altered the

---

[10]  Although Plaintiff alleges and discusses Defendants' inclusion of "guaranteed sales" and "charge-backs" in the 2008 estimate of gross sales, Plaintiff focuses his allegations and arguments on the inclusion of consignment shipments in the 2008 estimate.  The Court does the same.

'total mix' of information made available.'" *Dalberth*, --- F.3d at ---, 2014 WL 4390695, at *10 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988)).

The IBG Defendants argue that "no rational person or investor could read the definition of 'gross sales' in the PPM and conclude that [it] only included goods for which IBG had already been paid or for which it would certainly receive payment." (IBG Def. Mem. 13.) Contrary to Defendants' characterization, Plaintiff's allegation of misrepresentation is not that the PPM represented that the 2008 gross sales figure "only included goods for which IBG had already been paid or for which it would certainly receive payment." Rather, the Court understands Plaintiff's assertion to be that the PPM contained a representation as to 2008 "gross sales" that, by any definition of "gross sales," was false or misleading.

Reading the relevant provisions of the PPM, the Court agrees with Plaintiff that the PPM failed to convey crucial information "that a reasonable investor would have considered significant in making investment decision" — namely, that IBG was defining "gross sales" to include products for which the sale to a customer and the collection of payment was merely speculative rather than likely. The PPM explains that:

> The Company's gross sales include all shipped goods inclusive of merchandise sold by retailers pursuant to in-store promotions, coupons, slotting fees, co-operative advertising fees, rebate and free-bate programs. Accordingly, retailers deduct the cost of these goods and in certain programs deduct their per unit profit from their invoices which reduces the net cash receipts of the Company. *No assurances can be given that the Company will collect payment for all of the goods sold* as these deductions and other deductions are taken by retailers and, in certain cases, by wholesalers.

(PPM 19 (emphasis added).) Defendants rely on the above emphasized language to argue that the PPM expressly provided that payment may not be received for all "shipped goods." (Def. Mem. 12–13.) This language does not support the IBG Defendants' claim. It specifically references that IBG cannot assure collection on all goods *sold*, not as to all goods *shipped*. As

currently constructed, this section does not caution a reasonable investor that the term "gross sales" includes anything other than "goods sold."[11]

Moreover, while the sentence "retailers deduct the cost of these goods and in certain programs deduct their per unit profit from their invoices which reduces the net cash receipts of the Company" provides for the possibility that the net cash received by IBG for products *sold* by retailers could be less than the sales figure that is anticipated when the product is initially shipped to the retailer, there is nothing in this sentence that suggests more than the deduction of certain costs by the retailers. It does not inform a reasonable investor that some goods could be completely rejected and returned to IBG, without any payment having ever been made. Indeed, the language "deduct the cost of these goods and . . . their per unit profit from their invoices" suggests that retailers are making *some* payment to IBG, albeit a smaller payment than may have been initially anticipated by IBG at the time of shipment.[12]

_____

[11] Likewise, the word "sold" in the first sentence of this section of the PPM — "[t]he Company's gross sales include all shipped goods inclusive of merchandise sold by retailers" — is, at best, ambiguous; it is unclear if it is being used as the past tense of a verb, to describe merchandise that has been sold (as opposed to merchandise that will be sold), or if it is being used simply as an adjective to include merchandise that, as a general matter, will be sold by retailers pursuant to certain programs. To the extent that this word is ambiguous, the Court cannot say, at this early stage of the proceedings, that a reasonable investor would have understood it to mean what Defendants' urge. In addition, this sentence is missing a value term that would specify how IBG is quantifying the price for the shipped goods it includes in "the Company's gross sales" — the retail value of the goods at the time shipped to retailers, the price of the goods once sold by retailers, or the net price of the goods received by IBG.

[12] For this reason, the IBG Defendants' argument that the "bespeaks caution" doctrine bars Plaintiff's claim is without merit. (*See* IBG Defs. Mem. 17–18.) The bespeaks caution doctrine provides that "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Empls.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *see, e.g.*, *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 98 (2d Cir. 2004) (oral representations concerning, *inter alia*, "a financing which would raise $30 million" was "neutralized by . . . cautionary statements" such as "*[n]o assurance can be given, nor has any*

Even if the contested PPM language could be read to convey what Defendants urge, such an interpretation — that IBG recognizes revenue when it ships unsold product to a *retailer* — is contrary to IBG's own revenue recognition policy, as stated in the 2008 audited financial statement, which provides that "revenue is recognized at the time the product is shipped to the *buyer*." (2008 Audited Financial Statement at 5) (emphasis added). To the extent that such a reading would violate IBG's own revenue recognition policy, such a contradiction weighs in

---

*been given, that any of the Financing transactions . . . will be consummated*"); *In re Delcath Sys., Inc. Sec. Litig.*, --- F. Supp. 2d ---, ---, 2014 WL 2933151, at *10 (S.D.N.Y. June 27, 2014) (statements regarding the likelihood of FDA approval of one of its products not misrepresentation where defendants "consistently gave warnings that the FDA might not approve the Defendants' product, and no reasonable investor could have believed that there was no risk in this regard"); *In re Apple REITs Litig.*, No. 11-CV-2919, 2013 WL 1386202, at *11 (E.D.N.Y. Apr. 3, 2013) (statement of investment goals in prospectus, including "achieving long-term growth in cash distributions" and "acquiring income-producing real estate," not actionable misrepresentation, where prospectus included the caution that "we are a thinly-capitalized company and, as a result, you cannot be sure . . . if we will achieve the investment objectives described in this prospectus"); *see also Iowa Pub. Empls/' Ret. Sys.*, 620 F.3d at 142 n.7 (collecting examples).

Defendants argue that the language in the PPM stating that "[n]o assurances can be given that [IBG] will collect payment for all of the goods sold," clearly cautioned that IBG "would not collet payment for all goods that were included" in the "preliminary 'gross sales'" figure of $2,130,000 for 2008. (Def. Mem. 17–18.) However, "[i]n applying the judicially-created bespeaks caution doctrine . . . [the Second Circuit has] held that cautionary language that is misleading in light of historical fact cannot be meaningful." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010) (citing *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir. 2004)). Moreover, "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245 (2d Cir. 2014) (citing *Rombach*, 355 F.3d at 173). Here, the misleading statement is not "forward-looking," but rather is a statement, issued in May 2009, about preliminary 2008 gross sales. Even if the statement refers to "preliminary figures," the statement is not the type of prediction about future performance that the bespeaks caution doctrine encompasses; it is "preliminary" only in the sense that all of the analysis of the relevant data about past performance had yet to be finalized. In addition, the generic warning of risk in the PPM — that IBG might not collect payment for all goods "sold" — is insufficient in light of the undisclosed fact that IBG's method of calculating revenue included the value of goods shipped but not sold.

favor of finding the statement to be misleading.[13]  *See United States v. Tomasetta*, No. 10-CR-1205, 2012 WL 2064978, at *2 (S.D.N.Y. June 6, 2012) (finding that the defendants statements could give rise to "scheme to defraud" liability under the Exchange Act, where the company's policy "defer[red] recognition of revenue on such products until the products are sold by the customer to the end user" and "[t]he Government introduced evidence that, contrary to this disclosure, [the company] recorded the quarterly stocking packages as revenue when they were shipped to Nu Horizons, even though Defendants knew that Nu Horizons could and did frequently return large amounts of product"); *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 01-CV-6190, 2003 WL 23101782, at *24 (W.D.N.Y. Mar. 28, 2003) (finding that plaintiff's allegation that defendant pharmaceutical company "intentionally failed to report $6 million in [customer] rebates," stated a claim for misrepresentation, where this failure violated the company's own revenue recognition policy, which provided that " [t]he company establishes liabilities for estimated returns and allowances at the time of shipment").

---

[13]  In addition, using SEC documents as a guide to what a reasonable investor would understand "gross sales" to mean, the Court agrees with Plaintiff that a policy that recognized revenue upon shipment of unsold goods to an intermediate retailer, absent an accurate disclaimer, would be misleading. *See Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 153 (2d Cir. 2012) ("Staff Accounting Bulletin No. 101 . . . , issued by the Securities and Exchange Commission ('SEC') . . . states that four conditions must be satisfied before revenue can be recognized: (1) Persuasive evidence of an arrangement for the sale of goods or services exists, (2) Delivery has occurred or services have been rendered, (3) The seller's price to the buyer is fixed or determinable, and (4) Collectibility is reasonably assured." (alteration and internal quotation marks omitted) (quoting SEC Staff Accounting Bulletin No. 101, 1999 WL 1100908)); *cf. New Orleans Empls. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) ("Misstatements of income, such as Celestica's net earnings statements based on incorrect inventory valuations, can be material 'because earnings reports are among the pieces of data that investors find most relevant to their investment decisions.'" (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000)).

Because a reasonable investor would have considered the undisclosed fact that IBG was including consignment shipments of goods to retailers in determining whether to invest,[14] the omission of this fact from the May 2009 PPM was materially misleading within the meaning of § 10(b).[15]

---

[14] Plaintiff has insufficiently supported his allegation that the May 2009 PPM was misleading inasmuch as he argues that it failed to account for "guaranteed sales," which Plaintiff defines as an arrangement by which IBG "pay[s] retailers for its products if they went unsold," or "if a product did not sell, IBG would buy the product back from the retailer." (SAC ¶¶ 8, 40.) The Court does not analyze whether the failure of the May 2009 PPM to caution a reasonable investor that the estimate of 2008 gross sales included such "guaranteed sales" was a material misrepresentation. Ostensibly, Plaintiff's description of "guaranteed sales" could fall within the PPM "Risk Factors" disclaimer since they are technically "goods sold." However, the SAC and Plaintiff's memorandum of law lack any details explaining whether or why the omission of information explaining that the 2008 gross sales included "guaranteed sales" would be misleading to a reasonable investor. While the provision of the SEC Staff Accounting Bulletin relied on by Plaintiff explains why consignment arrangements violate its revenue recognition principles, it does not speak to guaranteed sales. (*See* SAC ¶ 45.) Consequently, the SAC, as currently pled, fails to sufficiently allege that the May 2009 PPM was misleading by not including information related to guaranteed sales.

[15] Relying on a footnote in the IBG Defendants' opening motion papers, Plaintiff asserts that "the IBG Defendants now openly admit in court papers that the 'gross sales' number did not actually represent sales, and that the money 'taken in' by IBG 'for goods shipped in 2008' was only $1,575,000." (SAC ¶ 39.) In the cited footnote, Defendants state, "The IBG Defendants further vehemently deny Plaintiff's allegation that IBG had few actual sales in 2008 [citing (Amended Complaint, ¶ 31)]. In actuality, IBG took in significant monies for goods shipped in 2008, taking in approximately $1,575,000." (Def. Mem. 12 n.4.) Plaintiff incorrectly assumes that the figure provided by Defendants in this footnote is its "actual sales" figure for 2008, asserting that IBG's actual sales in 2008 were "not more than $1.6 million." (Pl. Opp'n Mem. 21; *see id*. at 26 ("For the first time in its Motion to Dismiss, four (4) years after these figures should have been provided to Plaintiff, IBG purportedly provides the actual amount of money "taken in" by the Company in 2008.")) Plaintiff relies on this assertion to support his claim that the representation of 2008 sales as $2,130,000 was false. (*Id*. at 26 ("$1,575,000 is, of course, not the $2.1 million net sales number stated in Raiche Ende's 2008 audit.").) However, the cited statement does not bolster Plaintiff's claim of misrepresentation, where the PPM states only that "gross sales *include* shipped goods," but does not assert that it is comprised *exclusively* of shipped goods. (PPM 19.) Similarly, the footnote language cited by Plaintiff, that "IBG took in [approximately $1,575,000] for goods shipped in 2008," while a factual admission of payment collected for "goods shipped," is not an admission of 2008 actual sales. Indeed, Plaintiff concedes that "IBG's counsel does not state that $1,575,000 were revenues received for sales[,

### c.    Maker of the statement

The IBG Defendants argue that any statement made in the PPM cannot be attributed to them as individuals, as they were made by IBG and not by any one of them individually.  (IBG Def. Mem. 25.)  The Second Amended Complaint alleges that "[t]he IBG Defendants are liable for the false statements pleaded herein, as each one of those statements was 'group-published' information, the result of the collective actions of the IBG Defendants."  (SAC ¶ 26.)

The "group pleading doctrine" creates the presumption "that 'group-published' documents such as 'statements in prospectuses, registration statements, annual reports, [and] press releases' are attributable to 'individuals with direct involvement in the everyday business of the company,'"[16]  who either were or acted like a corporate insider.  *DeAngelis v. Corzine*, ---

---

but only states] that these amounts were 'taken in' for shipped goods."  (Pl. Opp'n Mem. 26.) While Plaintiff may be correct that he "still does not know what IBG's 2008 sales actually were," (*see id.*), his reliance on footnote 4 of the IBG's memorandum of law to establish that "the IBG Defendants now openly admit in court papers that the 'gross sales' number did not actually represent sales" is misplaced.

[16]  Several courts have questioned whether the group pleading doctrine is still viable after the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. ---, 131 S. Ct. 2296 (2011), which held that an investment adviser could not be held liable for "making" misleading statements in its clients' investment fund prospectuses, where the adviser at most "assisted" with crafting the statements, but did not have "ultimate authority" over the statement.  *Janus*, 564 U.S. at ---, 131 S. Ct. at 2300–302; *see In re ShengdaTech, Inc. Sec. Litig.*, No. 11-CV-1918, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) ("there is some question whether the group pleading doctrine has been abrogated by *Janus* . . . ." (citing *Rolin v. Spartan Mullen Et Cie, S.A.*, No. 10-CV-1586, 2011 WL 5920931, at *5 (S.D.N.Y.  Nov. 23, 2011) and *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 262 (S.D.N.Y. 2011))).  *Janus* addressed the liability of a party external to a corporate defendant rather than, as is the case with group pleading, the liability of individual corporate defendants.  In addition, the holding in *Janus* that "the maker of a statement is the person or entity with ultimate authority over the statement," does not appear to be incompatible with the premise of the group pleading doctrine that often more than one individual defendant has ultimate authority or control over a written statement. *See City of Pontiac Gen. Empls.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012) (noting that *Janus* "addressed only whether *third parties* can be held liable for statements made by their clients . . . and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability").

F. Supp. 2d ---, ---, 2014 WL 1695186, at *4–5 (S.D.N.Y. Apr. 16, 2014) (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005)); *see also Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 266 (2d Cir. 2010) (remanding the district court's dismissal of section 10(b) claims against individual defendants because "the district court did not address the individual defendants' liability under any of the other theories presented in the SAC, including liability for individual misstatements and omissions or liability for those attributable to them under the group pleading doctrine"); *City of Pontiac Gen. Empls.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) ([T]he 'group pleading' doctrine . . . allows a plaintiff to rely on a presumption that written statements that are 'group-published,' e.g., SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'"  (quoting *Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10-CV- 402, 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011))); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440–41 (S.D.N.Y. 2005) ("A plaintiff may invoke the group pleading doctrine against a defendant only if the plaintiff has alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company.").  The group pleading doctrine applies to collectively-authored *written* documents, but does not apply to oral statements.  *See Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10-CV-4020, 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011) (noting that the group pleading doctrine "does not apply to oral statements" (citing *In re AOL Time Warner, Inc. Sec. and Erisa Litig.*, 381 F. Supp. 2d 192, 220 (S.D.N.Y. 2004))).

### 1. Maggiore

Plaintiff alleges that, in addition to being a member of the Board of Directors, Maggiore was IBG's founder, and was its Chief Executive Officer for the relevant times during this action. (SAC ¶ 19.)  Plaintiff also notes that the PPM lists Maggiore as the "CEO and President" and

invites readers to contact him to ask questions and obtain additional information. (Pl. Opp'n

Mem. 7, 9–10 (citing PPM vi).) In addition, in the March 3, 2010 email from Maggiore to one of

the Lighthouse Financial brokers attaching an unsigned term sheet between IBG and Walgreens

for Fall 2010, which term sheet has Maggiore's name printed at the end of the agreement,

references a recent meeting between IBG and Walgreens, and states that Maggiore "would like

to detail our offering for Walgreens adding IBG's Throat Coolers product," supporting the

finding that Maggiore had "direct involvement in the everyday business of the company."

(Email dated Mar. 16, 2010, at 1, 3); *see DeAngelis v. Corzine*, --- F. Supp. 2d at ---, 2014 WL

1695186, at *4–5.) These allegations, taken together, are sufficient to support a claim that

Maggiore, as the Chief Executive Officer of IBG, was a corporate insider with directly

involvement in the everyday business of IBG, and who played a key role in "making" the

statement contained in the PPM regarding the 2008 gross sales.[17] *See City of Pontiac Gen.*

---

[17] The IBG Defendants' argue that the Second Circuit decision in *Pacific Investment Management Company LLC v. Mayer Brown LLP* ["*PIMCO*"], 603 F.3d 144 (2d Cir. 2010), imposes an "attribution" requirement on corporate board members and precludes a finding here that the individual defendants "made" the misleading statement. (IBG Def. Mem. 24–25; IBG Def. Reply 11–12.) Defendants further argue that "[a]nything short of directly attributing a statement to the defendant would run afoul of the Supreme Court's proscription against aiding and abetting liability under Section 10(b)." (IBG Def. Mem. 24 (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)).) The IBG Defendants' argument is only partially accurate and, in any event, is inapposite.

In *PIMCO* the Second Circuit addressed whether secondary actors could be held liable for statements drafted by them but not attributed to them. *PIMCO*, 603 F.3d at 148 (2d Cir. 2010). The court held that "attribution is required for secondary actors to be liable in a private damages action for securities fraud under Rule 10b–5." *Id*. at 152. The court defined "secondary actors" as "lawyers . . . , accountants, or other parties *who are not employed by the issuing firm* whose securities are the subject of allegations of fraud." *Id.* at 148 n.1 (emphasis added). The court expressly stated that because the case before them "does not involve claims against corporate insiders, [it] intimate[d] no view on whether attribution is required for such claims," *id*. at 158 n.6, acknowledging and declining to alter its holding in *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75–76 (2d Cir. 2001) that attribution was not required for a "corporate insider defendant." *PIMCO*, 603 F.3d at 152. The Court observed, however, that "[t]here may

*Empls.' Ret. Sys*, 875 F. Supp. 2d at 374–75 (finding basis for using group pleading doctrine as to the executive vice president of the defendant corporation who was "(1) the executive in charge of the division whose misconduct is at the heart of plaintiff's claims; (2) an officer of Lockheed; and (3) one of seven individuals listed as part of Lockheed's 'Leadership,'"); *Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10-CV- 4020, 2011 WL 1197659, at *9 (S.D.N.Y. Mar. 25, 2011) ("[B] y virtue of their executive positions within the company, Wheeler and Vitetta are linked to the allegedly fraudulent statements . . . .  Thus, under the group pleading doctrine, the complaint adequately links alleged fraudulent statements to Vitetta and Wheeler."); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 218–19 (S.D.N.Y. 2008) (finding that allegations about CEO of corporation defendant, who spoke frequently to the media about the corporation's financial performance and signed SEC registration forms and investment prospectuses sufficed to meet group pleading requirements); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) ("By virtue of their high level positions at the Company throughout

---

be a justifiable basis for holding that investors rely on the role corporate executives play in issuing public statements even in the absence of explicit attribution."  *Id*. at 158 n.6.  In light of this observation, albeit in dicta, the IBG Defendants' assertion that *PIMCO* held that "when considering potential liability of officers and directors of a company . . . the Second Circuit has held that in order to establish individual/direct liability, the Plaintiff must be able to attribute the purportedly false statements by the company to those officer" is inaccurate.  Since *PIMCO*, several district courts, as well as the Second Circuit, in an unpublished summary order, have continued to treat *Scholastic* as good law and/or have not imposed an attribution requirement on corporate insiders, including CEOs and Board members.  *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (finding that plaintiff stated a 10-b claim against the CFO and senior vice president of a corporation, despite a lack of allegations that they personally made the statements at issue) (collecting cases).

While the IBG Defendants are correct that it is well-established that there is no aiding and abetting liability under § 10(b), Plaintiff does not assert such a claim here.  Rather, Plaintiff claims that the IBG Defendants, members of IBG's board of directors, themselves *made* a materially misleading statement in the May 2009 PPM and through Lighthouse Financial brokers.  By relying primarily on case law that only addresses the liability of secondary actors, the IBG Defendants have not addressed the other legal bases for Plaintiff's assertion that the IBG Defendants in fact *made* the misleading statement at issue.

the Class Period, the Court is bound to infer at this stage that all three [individual defendants] had direct involvement in BISYS' daily affairs.")

Because the group pleading doctrine does not extend to oral statements, however, Maggiore cannot be said to have made the oral statements made by Lighthouse brokers to Plaintiff. *See Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 572 (S.D.N.Y. 2012) (rejecting plaintiff's attempt to use group pleading to assert that the chief financial officer could be held liable for oral statements made by the chair of the board, noting that plaintiff's did not overcome "the well-established rule that the group-pleading doctrine does not apply to oral statements"); *City of Pontiac Gen. Empls.' Ret. Sys.*, 875 F. Supp. 2d at 375 (finding that while executive vice president could be held liable under group pleading doctrine for statement made in written corporate materials, she could not be "held liable based on what [the company's CEO and CFO] said in their *oral* remarks.").

## 2. Remaining IBG Defendants

Plaintiff makes no factual allegations regarding Santiago's involvement in the preparation of the PPM, but appears to rely solely on his title as Chief Branding Officer and board member. (*See* SAC ¶ 20.) Although courts have found that a misleading statement may be attributable to a corporate insider "by virtue of [his] high level position[]," *see In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 441, Plaintiff does not directly allege or provide facts supporting the finding that Santiago "Chief Branding Office" is a "high level" executive position within IBG, or that he was involved with the development of the PPM. Absent any factual allegations with respect to Santiago, other than his title, the group pleading doctrine does not encompass Santiago.

Similarly, Plaintiff only alleges that the remaining IBG Defendants, Pragias, Kamen and Ward are members of the Board of Directors. (SAC ¶¶ 22–25.) Plaintiff fails to plead sufficient facts as to the IBG Defendants other than Maggiore and the remainder of the SAC contains very

few allegations which do not support a finding that the board members other than Maggiore were "corporate insiders" with direct involvement in the daily affairs of IBG.  Plaintiff alleges:

> (1) the IBG Defendants were high-level executives, directors, and/or agents at the Company and/or members of the Company's management team or had control thereof; (2) each of the IBG Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and distribution of the Company's May 2009 Private Placement Memorandum; (3) each of the IBG Defendants enjoyed significant personal contact and familiarity with the other IBG Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of the IBG Defendants was aware of the Company's dissemination of information to investors which they knew or recklessly disregarded was materially false and misleading.

(*Id.* ¶ 60.)

The allegations that suggests a greater-than-typical involvement of the board members in the day-to-day operations of IBG are conclusory — that "each of the IBG Defendants . . . was privy to and participated in the creation, development and distribution of the Company's May 2009" PPM, and "w[ere] aware of the Company's dissemination of information to investors which they knew or recklessly disregarded was materially false and misleading — are conclusory, and the remaining allegations do not suggest that these Defendants were acting as "corporate insiders."  Thus, the allegations are insufficient to establish that these IBG Defendants were involved in the day-to-day operations of IBG.  *See In re ShengdaTech, Inc. Sec. Litig.*, No. 11-CV-1918, 2014 WL 3928606, at *3, 10 (S.D.N.Y. Aug. 12, 2014) (finding on a motion to dismiss that allegations that two board members, who attended meetings of the Board of Directors and three Board committees, " held routine meetings with auditors and management," as members of the Audit Committee, and "had access to the adverse undisclosed information about [the corporation defendant's] business, operations, products, operational trends, financial

statements, markets and present and future business prospects via internal corporate documents"
were insufficient to "show that [the two individual defendants], who are outside directors,
exceeded those roles and became involved in the everyday business of" the defendant
corporation); *DeAngelis*, --- F. Supp. 2d at ---, 2014 WL 1695186 (S.D.N.Y. Apr. 16, 2014)
(finding on a motion to dismiss that plaintiff failed to allege sufficient facts to meet group
pleading requirements where the Complaint "makes no showing that the Independent Directors
were corporate insiders or involved in MF Global's day-to-day operations."); *cf. In re Citigroup
Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 239 (S.D.N.Y. 2010) (finding allegations outside director
who "wielded significant influence within the company and . . . convened the meetings in the
summer of 2007 that considered the company's CDO exposure" suffced to meet group pleading
requirement); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 452 (S.D.N.Y. 2006)
(allegations that outside director "had a consulting agreement with [corporation defendant] for
which he was paid $200,000 per year-exceeding the *salaries* of both of the other individual
defendants, the highest officers in the company, and that he "own[ed] 31% of GeoPharma
common stock" satisfied group pleading requirement).

### (2) "About to go public"

Plaintiff alleges that the IBG Defendants' statements, made orally through the Lighthouse
Financial brokers, that IBG "was about to go public" were untrue. (SAC ¶¶ 6, 31 63.) The IBG
Defendants argue that this representation is expressly contradicted by statements in the PPM and
in the Subscription Agreement signed by Plaintiff expressly acknowledging that "there is, and
there will be for the foreseeable future, no public market for the shares." (IBG Def. Mem. 16–
17.) Plaintiff does not respond to this argument and the Court therefore construes Plaintiff's
failure to respond as an abandonment of this claim. *See Reid v. Ingerman Smith LLP*, 876 F.

Supp. 2d 176, 186 (E.D.N.Y. 2012) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (quoting *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008))); *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 530 (S.D.N.Y. 2007) (deeming a claim abandoned due to the plaintiffs' failure to oppose the defendants' motion); *see also Jackson v. Fed. Exp.*, --- F.3d ---, ---, 2014 WL 4412333, at *5 (2d Cir. Sept. 9, 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them."). In any event, because Plaintiff alleges that the statement that IBG "was about to go public" was made orally by Lighthouse Financial brokers, (see SAC ¶ 31),[18] the statement could not have been *made* by the IBG Defendants pursuant to the group pleading doctrine, as discussed *supra* in Part II.b.i.1.A(1).c., and is thus not an actionable material misrepresentation by the IBG Defendants.

### (3) Representations about the use of proceeds

Plaintiff alleges that the IBG Defendants made false representations, in the PPM and through the Lighthouse Financial brokers, stating that the proceeds raised from the May 2009 private placement would go toward marketing and product development. (SAC ¶¶ 11, 31, 47.) The IBG Defendants argue that the PPM expressly provides that IBG "presently intends to use

---

[18]  The SAC also alleges "the IBG Defendants made material representations to Plaintiff, that Plaintiff relied upon in making his investments, orally and in writing, that IBG had over $2,130,000 in gross sales in 2008 (up from $289,000 in 2007), that the Company was 'about to go public,'" (SAC ¶ 6), but the only factual detail provided as to this statement is "[t]he Lighthouse Financial broker told Levy that IBG was on the verge of 'going public' and purchasing IBG shares was an opportunity to 'get in' before the public offering," (*Id.* ¶ 31). In the absence of any factual allegations that this statement was made in writing, the Court construes this allegation as referring solely to this as an oral statement.

the net proceeds of this Offering for inventory; implementation of the Company's marketing plan; salaries and bonuses; product development; and for general working capital." (IBG Def. Mem 15 (quoting PPM at 22).) Plaintiff does not respond to this argument. Thus, as discussed *supra* in part II.b.i.1.A(1).c.1, the Court considers Plaintiff to have abandoned this argument.

However, even if the Court considers Plaintiff's allegations, because Plaintiff alleges that these statements were made orally by the Lighthouse Financial brokers, as discussed *supra* in Park II.b.i.1.A.(1).c., such oral statements cannot be attributed to the IBG Defendants. As for the alleged misrepresentation, the express language of the PPM rebuts this claim. The PPM states that IBG "presently intends to use the net proceeds of this Offering for inventory; implementation of the Company's marketing plan; salaries and bonuses; product development; and for general working capital." (PPM 22.) In light of the express language of the PPM contradicting Plaintiff's allegations, the Court rejects Plaintiff's factual allegations challenging the statements made in the PPM about the use of proceeds. *See Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004))); *Empls.' Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co.*, 814 F. Supp. 2d 344, 353 (S.D.N.Y. 2011) ("[I]f a plaintiff's allegations are contradicted by [a document incorporated into the complaint by reference] those allegations are insufficient to defeat a motion to dismiss" (alteration in *Empls.' Retirement*) (quoting *Matusovsky v. Merrill Lynch,* 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002))); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (noting, the context of fraud claims, that "when the complaint alleges that [a document filed with the SEC] made a particular

representation, the court may properly look at the document to see whether that representation was made").

The Court concludes that the SAC pleads sufficient facts to establish that Maggiore made a material misrepresentation in the PPM by stating 2008 gross sales figures of $2,130,000, without disclosing that a significant portion of this sales figure was consignment sales.

### B. Scienter

The IBG Defendants argue that Plaintiff has not adequately pleaded scienter as to each IBG Defendant with respect to any of the allegedly misleading statements. (IBG Def. Mem. 25; IBG Def. Reply 12.) Plaintiff alleges that "[b]y virtue of their receipt or reckless disregard of information reflecting the true facts regarding IBG, . . . each defendant knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein." (SAC ¶ 27)

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)); *see also S.E.C. v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) ("Liability for securities fraud requires proof of scienter, defined as 'a mental state embracing intent to deceive, manipulate, or defraud.'" (quoting *Ernst*, 425 U.S. at 193 & n.12 (1976)). Because of the heightened pleading standard, a plaintiff asserting a securities fraud claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4; *Steginsky*, 741 F.3d at 368. A complaint will survive only if the factual allegations, "taken collectively, would allow a reasonable person to "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324).

Scienter "may be established by facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *City of Pontiac*, 752 F.3d at 184 (citation and internal quotation marks omitted). When a plaintiff seeks to establish scienter through evidence of recklessness, he may do so "through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Obus*, 693 F.3d at 286 (quoting *S.E.C v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998)); *see also City of Pontiac*, 752 F.3d at 184 (noting that, in this context, recklessness is defined as "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (quoting *Novak*, 216 F.3d at 308, 312)).

Circumstances comprising evidence of recklessness include allegations that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Novak*, 216 F.3d at 308); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76 ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.").

Because the Court finds that only Maggiore can be held liable for *making* the misleading statements, the Court assesses whether the SAC sufficiently alleges scienter as to Maggiore. The Amended Complaint alleges:

> each of the Defendants acted with scienter in that each defendant knew or recklessly disregarded that the documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Each defendant knew that such statements or documents would be issued or disseminated to investors and knowingly and substantially participated in or acquiesced in the making, issuance or dissemination of such statements or documents as a primary violation of the federal securities laws. By virtue of their receipt or reckless disregard of information reflecting the true facts regarding IBG, their control over and/or receipt and/or modification of IBG's materially misleading statements, and/or their other associations with the Company, each defendant knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein.

(SAC ¶ 27.)

### (1) Knowledge of facts contradicting misleading statement

In asserting that, "[b]y virtue of their receipt or reckless disregard of information reflecting the true facts regarding IBG, . . . each defendant knowingly or recklessly participated in the fraudulent scheme," (*id.* ¶ 27), Plaintiff's theory appears to be that Maggiore "knew facts or had access to information suggesting that their public statements were not accurate," *see ECA, Local 134*, 553 F.3d at 199. Under heightened pleading requirements, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309).

The SAC asserts that Wallner learned from Maggiore, during the "due diligence" process for his May 2011 purchase of the Power Ice brand from IBG, that IBG's 2008 and 2009 sales

34

were largely comprised of consignment shipments and "chargebacks," which are "shipments to retailers that had to be bought back by IBG if the product didn't sell." (SAC ¶ 8; Wallner Aff. ¶ 10.) However, there is nothing in that affidavit, or in any of Plaintiff's other submissions, to establish *when* Maggiore became aware that the shipments were consignment shipments, for which the likelihood of payment was merely speculative. Although Wallner's affidavit states that Wallner learned this information from Maggiore during the due diligence process associated with Wallner's May 2011 purchase of the Power Ice brand, it does not state or suggest that this due diligence process had begun as early as September 2009, when Plaintiff made his first purchase of IBG stock, nor does it otherwise provide a basis for the Court to infer that Maggiore may have known this information in 2009. Without any factual allegations establishing that Maggiore was aware in 2009 at the time that Plaintiff purchased his shares in IBG, that a significant portion of the claimed 2008 gross sales was consignment sales, there is an insufficient basis from which to draw the "strong inference" that Maggiore's actions were "highly unreasonable" representing "an extreme departure from the standards of ordinary care to the extent that the danger was either known to Maggiore or so obvious that Maggiore must have been aware of it." *See City of Pontiac*, 752 F.3d at 184; *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 629 (S.D.N.Y. 2009) (granting summary judgment "with respect to the plaintiffs who purchased all of their shares in the Funds prior to June 2001," because the plaintiffs could not show that they had the requisite scienter prior to that date); *cf. City of Pontiac Gen. Empls.' Ret. Sys.*, 875 F. Supp. 2d at 369 (finding that plaintiffs who purchased shares of common stock between April and July 2009 adequately pleaded scienter where "the Amended Complaint alleges, based on interviews with multiple confidential witnesses, that . . . in or around February 2009, three confidential witnesses who

were executives in [the Information Systems & Global Systems divisions] told [the individual defendant] that the financial goals for [those departments] for 2009 were overstated and could not be achieved," establishing the required strong inference that the individual defendant "knew the public representations made by Lockheed Martin about IS & GS were false").[19]

Because Plaintiff has not pleaded adequate factual allegations that Maggiore "knew facts or had access to non-public information contradicting" the public statement about the 2008 gross sales figures at the time the statement was made (or at least prior to Plaintiff's purchase of his shares), Plaintiff has failed to state a claim pursuant to 10(b) against the IBG Defendants. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76.

### (2)   Knowledge based on board membership

Plaintiff alleges in the SAC, and makes additional arguments in his opposition brief, that as a board member, Maggiore had the requisite level of scienter. (*See* SAC ¶¶ 59–62; Pl. Opp'n Mem. 23–24.) These allegations are insufficient to establish scienter. Plaintiff argues that scienter as to the IBG Defendants can be established by the fact that, as principal shareholders in

_____

[19]   The Court notes that the March 26, 2010 email from Maggiore to Feinstein in which Maggiore explains that "Walgreen's is taking in Children's Throat Cooler for the fall cough cold set," and attaches a proposed unsigned "term sheet" for a distribution arrangement with Walgreens, with Maggiore's name typed at the bottom of the term sheet, establishes that Maggiore was aware in 2010 that IBG engaged in a "guaranteed" sales transaction. (*See* Email dated Mar. 16, 2010, annexed to Travis Decl. as Ex. 7.) The term sheet includes a provision that IBG "agrees to a guaranteed sale on all products sold to Walgreens. [IBG] understands that if the item does not meet Walgreens['] sales expectations, Walgreens will . . . send all remaining store and DC inventory back to [IBG]." (*Id.* at 3.) The Court is not deciding whether the email and attached unsigned term sheet provide a sufficient basis to support the allegation that in 2009 at the time Plaintiff made his purchase, Maggiore knew that those "guaranteed" sales were included in IBG's estimated 2008 gross sales. Although, as noted *supra* in n.14, the SAC fails to plead sufficient facts establishing that the PPM was misleading with respect to guaranteed sales, the Court will grant  Plaintiff 30 days from the date of this Memorandum and Order to file a third amended complaint against Maggiore to attempt to assert a § 10(b) claim. Plaintiff should allege, if possible, a sufficient factual basis to show that knowledge of guaranteed sales would have rendered the statement that IBG's 2008 revenues were $2,130,000 misleading, and that Maggiore had the requisite scienter with respect to this statement.

IBG, each IBG Defendant was "incentivized to keep the company alive through investment." (Pl. Opp'n Mem. 23.)  However, "in attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to . . . sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

Plaintiff also argues that as members of the board, the IBG Defendants "would have to determine how effective the company had been in the prior year in terms of revenues generated," and points to the facts that (1) the auditors received the 2008 Audited Financial Statement on June 8, 2009, and (2) "immediately thereafter" IBG, "at the behest and authority of the board, amended the" May 2009 PPM.[20]  (Pl. Opp'n Mem. 23–24.)  While Plaintiff's rationale is not entirely clear, he appears to be arguing that the fact that the PPM was amended supports an inference that the individual members of the Board were aware that the 2008 sales figures represented in the PPM were inaccurate.  However, Plaintiff does not cite to any factual allegations in the SAC or propose additional factual allegations that would support the inferential leap that the amendment of the May 2009 PPM was the result of the Board of Directors realizing that the 2008 sales figures were inaccurate.  The July 23, 2009 amendment changed the number of shares offered and individual share price, but did not change the total proceeds to be raised through the May 2009 private placement.  Without a factual basis to support the inference that

---

[20]  The May 2009 PPM offered up to 5,000,000 shares at a price of $1.00 per share, for a total of gross proceeds of up to $5,000,000.  (PPM i.)  The amendment reduced the price of individual shares and increased the total number of shares issued by providing for the sale of up to 12,500,000 shares at a price of $0.40 per share, for a total of gross proceeds of up to $5,000,000.  (*Id.*)  (*See* Amendment dated July 23, 2009, annexed to Travis Decl. as Ex. 3.)

the decision to amend the PPM is indicative of knowledge or recklessness with respect to the fact that $2,130,000 in sales for 2008 was a misrepresentation, Plaintiff has not met the pleading standard for showing scienter as to Maggiore.

In sum, Plaintiff has pleaded sufficient factual allegations that the statement about estimated 2008 gross sales in the May 2009 PPM was misleading because it failed to convey that this gross sales figure including consignment shipments, and under the group pleading doctrine, this statement is attributable to Maggiore as a corporate insider.  However, the SAC lacks sufficient factual allegations, under the heightened pleading standard, to raise the strong inference that Maggiore acted with the requisite state of mind in *making* this statement. Accordingly, Plaintiff's § 10(b) claim against the IBG Defendants is dismissed.

### 2. Section 10(b) claim against Raiche Ende

Plaintiff's § 10b claim against Raiche Ende is that "[t]he May 2009 PPM attributes the following fraudulent statement to Raich Ende: '[t]he Auditors [Raich Ende] have informed the Company that the preliminary audited results for 2008 will reflect gross sales of approximately $2,130,000, as compared to 2007 gross sales of $289,000," which statement was a misrepresentation as "[t]he 2008 'sales' figures provided by Raich Ende were fictitious."  (SAC ¶ 90(i).)  Plaintiff argues that the statement in the May 2009 PPM regarding the 2008 gross sales figure can be attributed to Raiche Ende because Raiche Ende admitted to assisting with the preparation of this statement, and because the PPM attributes the statement to Raiche Ende.[21]

_____

[21]  Plaintiff also appears to allege that the 2008 audited financial statement, released on June 8, 2009, also contained a misleading statement that IBG's 2008 "net sales" were $2,130,000.  (SAC ¶ 51 ("Raich Ende's audit is a misrepresentation because the $2,130,000 'net sales' figure is based upon product shipments not sales to a buyer, as claimed by Raich Ende.").) Plaintiff further alleges that Raiche Ende conspired with officers of IBG to hide material amounts of income to the officers and directors by failing to identify on IBG tax returns the

(Pl. Opp'n Mem. 30–31.)  Raiche Ende argues that Plaintiff has failed to plead with particularity (1) material misrepresentation or omission, (2) scienter, or (3) reliance, and further argues that any statement made in the May 2009 PPM cannot be attributed to Raiche Ende.  (Raiche Ende Memorandum of Law in Support of Motion to Dismiss ("Raiche Ende. Mem.") 6, 8–18.)

The only potentially actionable statement against Raiche Ende is the statement in the May 2009 PPM that "the preliminary audited results for 2008 will reflect gross sales of approximately $2,130,000."  (*See* PPM 11.)  Even assuming that the SAC adequately alleges that this statement in the PPM could be attributed to Raiche Ende, because Plaintiff fails to meet the exacting standard for establishing scienter against an auditor with respect to the PPM statement, Plaintiff's § 10(b) against Raiche Ende fails.

### A.  Scienter

To adequately plead recklessness as the basis for scienter as to an auditor, a plaintiff must show "conduct that is highly unreasonable, representing an extreme departure from the standards

---

amount of compensation paid to them.  (*Id.* ¶ 89(iii).)  However, Plaintiff has not alleged that he was aware of and relied on the 2008 Audited Financial Statement, or either IBG's or the IBG Defendants' tax returns, prior to purchasing his shares.  Because Plaintiff does not allege that he was aware of the 2008 Audited Financial Statements or the tax returns prior to purchasing his shares, Plaintiff cannot establish that he relied on these alleged misrepresentations, necessary to meet the reliance element of his §10(b) claim.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 573 U.S. ---, ---, 131 S. Ct. 2179, 2181(2011) ("The traditional way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction — *e.g.,* purchasing common stock — based on that specific misrepresentation."); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.  It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability.").  Accordingly, Plaintiff cannot premise a §10(b) claim against Raiche Ende based on the 2008 Audited Financial Statement or the tax returns; the only potentially actionable statement is the statement in the May 2009 PPM that "the preliminary audited results for 2008 will reflect gross sales of approximately $2,130,000."  (*See* PPM 11.)

of ordinary care," and that "approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 640 (2d Cir. 2012) (quoting *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)); *see also Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, No. 13-CV-1094, 2014 WL 3605540, at *15 (S.D.N.Y. July 21, 2014) ("The pleading requirements for auditor scienter are particularly stringent." (collecting cases))). A plaintiff may plead facts demonstrating that "an audit was so shoddy as to constitute 'no audit at all,'" or that the "auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 623 (2d Cir. 2012), *as amended* (June 13, 2012) (quoting *In re Tremont Sec. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010)). "The failure of a non-fiduciary accounting firm to identify problems with a company's internal controls and accounting practices does not constitute recklessness." *Stephenson*, 482 F. App'x at 623 (alteration omitted) (quoting *Novak,* 216 F.3d at 309).

Plaintiff argues that scienter as to Raiche Ende can be established by the fact that (1) Raiche Ende's violated General Acceptable Accounting Principles ("GAAP") in conducting an audit that counted consignment sales as revenue in order to come up with the "preliminary" gross sales estimate of $2,130,000 in 2008, and (2) Raiche Ende disregarded "red flags in IBG's PPM that [IBG] was engaged in the practice of calling product shipments and consignments, 'sales,' in order to inflate its sales figures for the purpose of luring investors." (Pl. Opp'n Mem. 30.) Plaintiff further asserts that Raiche Ende "knew, because it was its duty to know," that IBG recognized revenue when a product was shipped, rather than when it was shipped to an actual buyer. (*Id.*) Raiche Ende argues that Plaintiff's allegations do not meet the high standard for

establishing scienter as to an auditor.  (Raiche Ende Def. Mem. 13–15; Raiche Ende Reply 10–11.)

"Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," *ECA*, 553 F.3d at 200 (2d Cir. 2009) (quoting *Novak,* 216 F.3d at 309)), as Plaintiff concedes, (*see* Pl. Opp'n Mem. 12).  However, allegations of GAAP violations, "coupled with evidence of corresponding fraudulent intent," may be sufficient."  (*Id*.)  One type of evidence of fraudulent intent is the existence of "red flags" that were ignored by an external auditor.  "A 'red flag' is a sign consciously disregarded by the auditor that 'would place a reasonable auditor on notice that the audited company was engaging in wrongdoing to the detriment of its investors.'"  *Perry v. Duoyuan Printing, Inc.*, No. 10-CV-7235, 2013 WL 4505199, at *7 (S.D.N.Y. Aug. 22, 2013) (quoting *In re IMAX Secs. Litig.,* 587 F. Supp. 2d 471, 483–84 (S.D.N.Y. 2008)).

### 1.  Violation of GAAP Principles

Plaintiff's argues that Raiche Ende violated GAAP revenue recognition principles in including consignment shipments in its "preliminary estimate" published in the May 2009 PPM.  This argument relies on the assumption that Raiche Ende actually knew, or consciously disregarded a significant likelihood, that IBG itself was counting consignment shipments as sale revenue.  Plaintiff argues that Raiche Ende "knew or should have known" that these consignment shipments were not actual sales.  However, the only evidence Plaintiff can muster in support of this assertion is the fact that Raiche Ende states in the 2008 Audited Financial Statement that as part of its audit procedures Raiche Ende "examines [the] evidence supporting the amounts and disclosures on financial statements," and "was obligated to review [IBG's] finances for its audit."  (Pl. Opp'n Mem. at 28–29 (quoting 2008 Audited Financial Statement 1).)  This

argument establishes, at most, that Raiche Ende acted negligently in not uncovering, through its auditing process, that IBG was counting consignment shipments as sales revenue, but does not establish that Raiche Ende's actions were "highly unreasonable, representing an extreme departure from the standards of ordinary care," or otherwise "approximate[d] an actual intent to aid in the fraud being perpetrated" by IBG. *See Meridian*, 487 F. App'x at 640; *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 623 (2d Cir. 2012) ("[T]he failure of a non-fiduciary accounting firm to identify problems with [a company's] internal controls and accounting practices does not constitute reckless[ness]." (alteration in *Stephenson*) (quoting Novak, 216 F.3d at 309)), *as amended* (June 13, 2012); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d at 394 (noting that while "plaintiffs have alleged that a reasonable auditor would have discovered the problems with IBG's valuation of the deferred tax assets and internal controls," that "such allegations would support a claim of negligence, but would not 'approximate an actual intent to aid in the fraud being perpetrated' " (quoting *Rothman*, 220 F.3d at 98)); *see also Nappier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 276 (D.N.J. 2002) (finding plaintiff's failed to establish scienter as to external auditor where plaintiff alleged that "in light of [the auditor's] extremely close working relationship with [the audited company], including its long history as [audited company's] auditor and its role as consultant to [the audited company], there is at the very least a strong inference that [the auditor] was aware of and reviewed (or recklessly ignored) credit memoranda and return authorizations and similar basic documents that revealed . . . the guaranteed sales").

## 2. "Red flags"

Even assuming that Plaintiff had pleaded sufficient facts to establish that Raiche Ende in fact knew about IBG's policy of counting consignment shipments as revenue and violated GAAP

principles, Plaintiff fails to establish that Raiche Ende ignored the existence of red flags that would have placed a reasonable auditor on notice that IBG was engaged in fraudulent activity. While Plaintiff alleges that Raiche Ende disregarded red flags, the only red flag cited by Plaintiff is the statement in the May 2009 PPM that IBG's "gross sales include all shipped goods." (Pl. Opp'n Mem. 30.) Because this statement appeared in the same publication as the allegedly misleading statement by Raiche Ende that the "preliminary estimate" of 2008 gross sales was $2,130,000, Plaintiff cannot show that the statement placed Raiche Ende "on notice" with respect to the veracity of its own statement.[22] *See In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11-CV-2279, 2012 WL 3758085, at *16 (S.D.N.Y. Aug. 29, 2012) ("In order for a red flag to support a strong inference of scienter, the auditor must have actually been aware of its existence.").

Plaintiff has alleged no red flags other than the statements in the PPM that were missed by Raiche Ende during the auditing process. The general allegations that, as the external auditor, Raiche Ended had access to information that should have served as a red flag is insufficient to support the inference of recklessness. *See Stephenson*, 768 F. Supp. 2d at 575 (finding that purported "red flags" that "allege no more than that [defendant auditor] had access to information by which it could have discovered warning signs of fraud or that [defendant] would have discovered these warnings signs if it had conducted an audit in accordance with GAAS and its own policies" were insufficient to support an inference of scienter).

Because Plaintiff has not alleged sufficient facts to support an inference that Raiche Ende both knew that IBG was counting consignment revenues as actual sales in violation of GAAP

---

[22] At most, this red flag speaks to Raiche Ende's scienter with respect to the 2008 audited financial statement, which was released subsequent to the May 2009 PPM; the Court considers this argument *infra*.

principles, and that it acted with the requisite level of recklessness in ignoring any specific red flags that would have put a reasonable auditor on notice that IBG was engaging in wrongdoing to the detriment of its investors, the SAC does not meet the high standard of showing recklessness approximating intent to aid in the fraudulent conduct. Therefore, the SAC fails to state a claim against Raiche Ende pursuant to section 10(b) of the Exchange Act.

### ii. Section 20(a) claim

The SAC alleges that the IBG Defendants are liable either as primary violators or as controlling persons pursuant to § 20(a), and alleges that "[t]he IBG Defendants acted as controlling persons of IBG . . . ." (SAC ¶ 69.) "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *see also ECA*, 553 F.3d at 207 ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person.").

Even if Plaintiff had been able to allege a claim of primary violation by IBG upon which to predicate the IBG Defendants liability as controlling persons, this claim fails for the same reason that the § 10(b) claim fails. Plaintiff has insufficiently pled the requisite state of mind — here, "culpable participa[tion]." This culpable participation requirement of § 20(a) "is similar to the scienter requirement of Section 10(b); plaintiffs must 'plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 661 (quoting *In re Global Crossing, Ltd. Secs. Litig.*, 471 F.

Supp. 2d 338, 351 (S.D.N.Y. 2006)); *see McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 122–23 (S.D.N.Y. 2013) ("In order to withstand a motion to dismiss, a § 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness."); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 598 (S.D.N.Y. 2010) (same).

Here, the lack of factual allegations that precludes a finding that the IBG Defendants acted with the scienter necessary to plead a § 10(b) claim also requires dismissal of the § 20(a) claim. *See In re Alstom SA*, 406 F. Supp. 2d 433, 493 (S.D.N.Y. 2005) (finding that plaintiffs had not pled culpable participation as to the controlling persons where they "have not alleged any facts supporting a strong inference of any extreme conduct that even approximates recklessness . . . .").

### b. Other fraud claims

The SAC alleges claims of common law fraud and fraud in the inducement against the IBG Defendants, based on their material misrepresentations regarding IBG's sales figures, plans to go public, and intended use of Plaintiff's investment, made with the intention of causing Plaintiff to invest in IBG. (SAC ¶¶ 73–88.) The SAC also alleges that Raiche Ende engaged in fraud and aiding and abetting fraud by materially concealing the fact that IBG did not have $2,130,000 in sales and by conspiring with officers of IBG to hide income paid to the directors. (*Id.* ¶¶ 90, 97.)

Under New York law, the elements of a fraud claim are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). A fraud in the inducement

claim has the same elements as a fraud claim, but allows a plaintiff to bring an action "when the misrepresentation is collateral to the contract it induced." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (citing *WIT Holding Corp. v. Klein*, 724 N.Y.S.2d 66, 68 (App. Div. 2001) ("[A] misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud.")).

In the securities context, these elements are "essentially the same" as "the elements necessary to establish a claim under 10(b)."[23] *Marini v. Adamo*, 995 F. Supp. 2d 155, 197 (E.D.N.Y. 2014) (citing *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y.2010), *aff'd sub nom. Meridian Horizon Fund, LP v. KPMG (Cayman),* 487 F. App'x. 636 (2d Cir. 2012), and *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 298 (S.D.N.Y. 2011)). Because Plaintiff fails to allege sufficient facts to support a finding the the misleading statement in the May 2009 PPM can be attributed to any IBG Defendant other than Maggiore, Plaintiff's claims of fraud and fraud in the inducement as to Santiago, Pragias, Kamen and Ward are dismissed. *See In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 372 (S.D.N.Y. 2010) ("the elements of Section 10(b) claims are essentially the same as those for common law fraud in New York. Since plaintiffs' Section 10(b) claim does not survive, plaintiffs' common law fraud claim, based on the same allegations of fact, must be dismissed as well.") Because Plaintiff does not allege sufficient facts to support a finding that Maggiore acted with the requisite scienter necessary to support a §10(b) claim, the SAC, as currently pled, also fails to state a claim of common law fraud and fraud in the inducement as to Maggiore.

---

[23] Plaintiff's memorandum of law does not distinguish between the § 10(b) claims and the common law claims, reinforcing the Court's identical analysis of the federal and state claims.

Plaintiff's claim of aiding and abetting fraud against Raiche Ende is also without merit. Under New York law, the elements of an aiding and abetting fraud claim are: "(1) the existence of a fraud; (2)[ the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Krys*, 749 F.3d at 127 (alteration in original). Here, because Plaintiff has not established a primary fraud claim that Raiche Ende aided or abetted, this claim also fails.

### c. Amendment of the Complaint

Plaintiff seeks leave to submit a proposed Third Amended Complaint. Plaintiff states that the Third Amended Complaint "asserts the same claims on similar facts as the First Amended Complaint, but adds a second plaintiff."[24] (Pl. Letter dated May 14, 2014.) The Second Amended Complaint and the proposed Third Amended Complaint include additional factual allegations in addition to adding a second plaintiff. The proposed Third Amended Complaint alleges that the proposed additional plaintiff, Tiffany Hott, purchased 70,000 shares of IBG stock in February 2010, but provides no further factual allegations with respect to her claims. (Proposed Third Amended Complaint ¶ 4.) The proposed Third Amended Complaint also includes the names of the Lighthouse Financial brokers referenced in the SAC, and includes the factual admission from Defendants' summary judgment motion papers that "IBG now claims . . . that in actuality, IBG took in significant monies for goods shipped in 2008, taking in approximately $1,575,000." (*Id.* ¶ 56.) Plaintiff alleges that "[t]his $1,575,000 appears to be gross and is, of course, not the $2.1 Million net sales number stated in Raich[e] Ende's 2008 Audit." (*Id.*)

---

[24] Plaintiff's letter seeking leave to submit the proposed Third Amended Complaint does not reference the Second Amended Complaint that was included with Plaintiff's opposition papers.

The additional allegations in the proposed Third Amended Complaint are insufficient to withstand a motion to dismiss with respect to Plaintiff's claims against Santiago, Pragias, Kamen, and Ward (the remaining IBG Defendants other than Maggiore), and against Raiche Ende. While the Court recognizes its obligation to freely give leave to amend a complaint "when justice so requires," *see* Fed. R. Civ. P. 15, here, the proposed Third Amended Complaint does not address the deficiencies and gaps in Plaintiff's allegations with respect to these Defendants — namely, that (1) any statement other than the one about 2008 gross sales in the May 2009 PPM was a material misrepresentation, (2) any individual IBG Defendant other than Maggiore made this misleading statement in the PPM, or (3) Raiche Ende acted with the an exacting level of recklessness required to establish scienter. Because granting leave to amend as to Plaintiff's claims against Santiago, Pragias, Kamen, and Ward and against Raiche Ende would be futile, the Court denies Plaintiff's application to amend as to them. *See Savitsky*, 210 F. App'x at 72.

Plaintiff's application to add a second plaintiff, as currently pled, is also insufficient to state a claim as to Maggiore because Plaintiff alleges only that Hott purchased 70,000 shares of IBG stock in February 2010, but provides no specific factual allegations as to the proposed plaintiff's awareness of and reliance on the statement in the May 2009 PPM or on any other statement. Plaintiff is granted 30 days leave to submit a Third Amended Complaint with additional factual allegations as to the proposed additional plaintiff, and any additional factual allegations necessary to state a viable claim for securities fraud pursuant to the Exchange Act § 10(b) and the common law claims of fraud and fraud in the inducement against Maggiore.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motions to dismiss the Second Amended Complaint, denies Plaintiff's application to submit the proposed Third Amended Complaint, but grants 30 days leave to amend the Second Amended Complaint.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 29, 2014
      Brooklyn, New York